### John L. Grandin *et al* *vs.* E. G. La Bar.

Opinion filed May 3rd, 1893.

**Adverse Claimants to Public Lands—Jurisdiction.**

> Courts are without jurisdiction to declare the rights of parties to certain real estate while the title to such real estate remains in the United States, and a contest is pending in the interior department between one of the parties litigant and the grantor of the other to test their claims to the land. Until the title passes from the United States, exclusive jurisdiction to determine the rights of adverse claimants to such land rests in that department of government charged by law with the disposal of the public lands.

**Railroad Grants—When Title Passes.**

> The grant of lands by congress to the Northern Pacific Railroad Company did not vest in said company, upon the definite location of its line, title to any lands within what is known as the "Idemnity Belt." Nor does the selection of such lands by the company, without the approval or sanction of the secretary of the interior in some manner expressed, pass any title to the railroad company; but such selection so far segregates the land selected from the public domain that any party subsequently seeking to acquire rights therein takes the same subject to the ultimate decision of the interior department as to the legality of such selection.

Appeal from District Court, Traill County; *McConnell*, J.

Action by John L. Grandin and William J. Grandin against E. G. La Bar to quiet title to land, and for an injunction. Plaintiffs had judgment, and defendant appeals.

Reversed.

*S. B. Pinney* & *J. B. Robinson*, for appellant.

*Carmody* & *Leslie*, (*F. M. Dudley* and *Ball* & *Watson*, of Counsel,) for respondent.

BARTHOLOMEW C. J. This case was before this court at the October term, 1891, upon an interlocutory order, and is reported in 2 N. D. 206, 50 N. W. 151. A full summary of the pleadings is given in that case, and need not be repeated here. It will answer our purpose to state that the plaintiffs and respondents claim to be the equitable owners of a certain quarter section of land in Traill County by virtue of a purchase from the Northern Pacific Railroad Company, made and recorded in 1876. The land is in what is known as the "Indemnity Belt" of lands granted by congress to said railroad company, and no patent therefor has ever been issued by the United States. It is alleged that the defendant and appellant is in possession of said land, and is cropping the same, and sapping the land of its goodness and strength, and that appellant is entirely insolvent. A decree is asked, declaring respondents to be the equitable owners of said land, and that appellant has no right, title, or interest therein, and perpetually enjoining appellant from tilling said land, or in any manner interfering therewith. The answer denies all the allegations of ownership contained in the complaint, and sets forth that the appellant is in possession of the land under the pre-emption laws of the United States; that said land was at the time of appellant's settlement thereon, and still is, public land of the United States subject to pre-emption, and was so declared by order of the secretary of the interior, dated August 15th, 1887; and it further avers that a contest was and is pending before the commissioner of the general land office, between this appellant and respondents' grantor, to determine the rights of the respective parties in this particular tract of land.

The conclusion we have reached in this case renders it unprofitable and improper for us to discuss more than a single error assigned. While the pendency of a contest before the interior department between the appellant herein and respondents'

grantor to determine their rights to the land in controversy was pleaded in abatement of this action, yet the learned trial court seems to have regarded the plea as bad. No finding is made upon the question, and evidence was excluded that would have established the pendency of such contest. Whether or not such plea was bad depends upon the condition of the title. 'If the United States had parted with its title,—if the legal title had passed to respondents' grantor, the Northern Pacific Railroad Company,—then the interior department is without further jurisdiction in the matter, and all controversies about the title must be waged in the properly constituted courts. If, on the other hand, the legal title still remains in the general government, and has not been so entirely earned by some other party that nothing remains to be done except the mere ministerial act of issuing a patent to such party,—if any act remains to be done; or any controverted question of fact remains to be considered and passed upon, before any party is entitled to patent,—then the interior department is the tribunal constituted by law and authorized to hear and determine all questions pertaining to the rights of the respective parties to receive the patent. *Steel* v. *Refining Co.*, 106 U. S. 447, 1 Sup. Ct. 389; *Johnson* v. *Towsly*, 13 Wall. 72; *Moore* v. *Robbins*, 96 U. S. 538; *Marqueze* v. *Frisbie*, 101 U. S. 473; *U. S.* v. *Schurz*, 102 U. S. 396. If respondents recover in this case, it must be upon the strength of their title to, or rights in, the land in controversy. Absence of all title or right in appellant will not aid them. What then, is the nature of their title or right? It appears from the undisputed evidence in this case that in March, 1883, the land in controversy was selected by the agent of the Northern Pacific Railroad Company to indemnify said company for the loss of certain lands within the limits of their primary grant. A list of selections, and a list of lands in place lost to the company, was filed in the local land office at Fargo, and forwarded to the general land office in Washington. It is alleged and found as a fact that these selections were made under the direction of the secretary of the interior. The only evidence in the record of this fact,

if it can be called evidence, is a recital in an opinion of the secretary of the interior in the case pending in that department that such was the fact.   But that opinion is not final; the case is still pending on a motion for rehearing, and hence there is nothing to support the finding that the selection was made "under the directions of the secretary of the interior."    The record fails, also, to show that any action whatever was ever taken by the interior department upon the list of selections filed on March 19th, 1883, and which contained the land in controversy.   Upon the record as made, it appears that this land was within the belt of lands from which the respondents' grantor was authorized to select lands to indemnify it for lands lost within the limits of the original grant; that such land had been "selected" by the Northern Pacific Railroad Company, and a list containing the land filed in the land office at Fargo, and forwarded to the general land office at Washington.   What right or title to this land did the railroad company obtain by reason of these facts?   It is urged by the respondents that the grant to the Northern Pacific Railroad Company by the act of congress approved July 2nd, 1864, was a grant in quantity and in *præsenti*, and that, upon the filing of the map of definite location, the title became fixed in the company, not only to the lands within the original grant then remaining subject to the terms of this grant, but also to so much of the odd sections in the indemnity belt as might be required to make good to the railroad company the full quantity of 20 sections per mile on each side of its line, and that this title passed by virtue of the grant; and that, where the whole of the odd sections within the idemnity belt was required to make up the deficiency, no selection was required,— that the entire belt was withdrawn from settlement by the act of congress; and that, where all the lands within the belt were not required to make up the deficiency, a selection was necessary, not to pass title, but to designate what land was subject to settlement. This we regard as the substance, though not the language, of respondents' argument.

N. D. R.—29.

The portion of the granting act here involved is as follows: "That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Paicific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war and public stores over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternative sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof the United States have full title not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved, occupied by homestead settlers or pre-empted, or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections. * * * That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad; and the odd sections of land hereby granted shall not be liable to sale, or entry, or pre-emption before or after they are surveyed, except by said company, as provided by this act." These and similar provisions have been often before the courts, and we believe their scope to be well defined and declared, and respondents' contention is without substantial support in the authorities. That the grant was a grant in *præsenti* as to the lands subject to the grant that were situated

within the 40-mile limit has been often decided, and the cases are familiar; but beyond that limit it has never been held that the grant in *præsenti* extended, except in the single case of *Railroad Co.* v. *Barnes,* 2 N. D. 310, 51 N. W. 386. The other cases most relied upon as sustaining that position are *Railroad Co.* v. *Wiggs,* 43 Fed. 333, and *St. Paul & P. R. Co.* v. *Northern Pac. R. Co.,* 139 U. S. 1, 11 Sup. Ct. 389. An examination of these cases will disclose that they arose within what were states at the date of the granting act, and, consequently, where the 40-mile limit covered both the original grant and the indemnity belt. In *Buttz* v. *Railroad Co.,* 119 U. S. 55, 7 Sup. Ct. 100, the court used this language: "The sixth section declares that, after the general route shall be fixed, the president shall cause the lands to be surveyed for forty miles in width on both sides of the entire line as fast as may be required for the construction of the road, and that the odd sections granted shall not be liable to sale, entry, or pre-emption before or after they are surveyed, except by the company. The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country or from knowledge of it, and is designated by a line on a map showing the general features of the adjacent country, and the places through or by which it will pass. * * * When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing the map thereof with the commissioner of the general land office or the secretary of the interior, the law withdraws from sale or pre-emption the odd sections to the extent of 40 miles on each side." The case in 139 U. S. 11 Sup. Ct., it is true, holds that under the facts in that case the whole of the odd sections in the indemnity belt were required to make up the deficiency for lands in place lost, and that no selections whatever were required. Yet it is clear to us that such holding is based on the fact that, both by the law and by order of the secretary of the interior, such lands had been withdrawn and segregated from the public domain for the exclusive use and benefit of the Northern Pacific Railroad

Company. In speaking of the nature of the grant to the Northern Pacific Railroad Company, the court say: "As seen by the terms of the third section of the act, the grant is one in *præsenti;* that is, it purports to pass a present title to the lands designated by alternate sections, subject to such exceptions and reservations as may arise from sale, grant, pre-emption, or other disposition, previous to the time the definite route of the road is fixed. The language of the statute is 'that there be, and hereby is, granted' to the company, every alternate section of the lands designated, which implies that the property itself is passed, not any special or limited interest in it. The words also import a transfer of a present title, not a promise to transfer one in the future. The route not being at the time determined, the grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved. It is in this sense that the grant is termed one in *præsenti;* that is to say, it is of that character as to all lands within the terms of the grant, and not reserved from it at the time of the definite location of the route." That the court was there speaking exclusively of the lands within the original grant is clear from the fact that it is only from those lands that any reservations are made by reason of sales, grants, or pre-emptions. Nor is the case in 43 Fed. better authority for respondents' position. The case arose in California under the grant to the Southern Pacific Railroad Company, which has the same provisions substantially that are found in the grant to the Northern Pacific. Prior to the time the alleged rights of the defendant were initiated, the land had been withdrawn from settlement, both by the express terms of the statute, as stated in the opinion, and by the order of the secretary of the interior. The opinion does not treat of the date at which title to the company passed, but of the date after which no adverse rights could attach; and while it is not necessary for us to either indorse or reject all that is said on that point by the learned judge who

wrote that opinion, yet the case is certainly no authority for the position that title to indemnity lands passed to the beneficiary by virtue of the grant and in *præsenti*.

Nor do we find in the wording of the statute any support for respondents' position. It reads: "That there be, and hereby is, granted to the Northern Pacific Railroad Company * * * every alternate section of land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line." It is the "twenty alternate sections per mile" that constitutes the present grant. From those sections certain possible exceptions and reservations are made, and then follows a privilege to the company, in case of losses by reason of such exceptions and reservations, to select lands in other alternate odd numbered sections, "not more than ten miles beyond the limits of said alternate sections." But this privilege did not constitute a present grant. It vested in the railroad company a right through and by which, in the contingency specified, it might acquire title to the additional or indemnity lands. But it required something more than the existence of the grant, and the location and construction of the railroad in accordance with the terms of the grant, to vest the title to such additional lands in the company. It required a legal selection; and until such selection was made, and the legality of the selection in some manner established, the company could claim no right or interest whatever in any specific tract within the indemnity belt. *Ryan* v. *Railroad Co.*, 99 U. S. 382; *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Railroad Co.* v. *Herring*, 110 U. S. 27, 3 Sup. Ct. 485; *Kansas Pac. R. Co.* v. *Atchison, etc., R. Co.*, 112 U. S. 414, 5 Sup. Ct. 208; *St. Paul, etc., R. Co.* v. *Winona, etc., R. Co.*, 112 U. S. 720, 5 Sup. Ct. 334; *Wisconsin Cent. R. Co.* v. *Price Co.*, 133 U. S. 496, 10 Sup. Ct. 341; *U. S.* v. *Missouri, K. & T. R. Co.*, 141 U. S. 385, 12 Sup. Ct. 13; *Elling* v. *Thexton*, (Mont.) 16 Pac. 931; *Jackson* v. *LaMoure Co.*, 1 N. D. 238, 46 N. W. 449. The decision in *Railroad Co.* v. *Barnes*, 2 N. D. 310, 51 N. W. 386, upon the question here discussed, was reached upon the assumption

that the grant to the Northern Pacific Railroad Company was a grant in quantity absolutely; that the government was bound to withhold from settlement sufficient land to enable the railroad company to receive an amount equal to 20 sections per mile on each side of its road, and hence could dispose of no lands in the indemnity belt unless a sufficient quantity remained undisposed of to fill the requirements of the grant. We are entirely satisfied that this assumption was unwarranted. The grant fixed the *termini* of the contemplated line,—one upon Lake Superior, and the other upon Puget sound,—but the company was at liberty to construct the line upon any route that it deemed most feasible, within the boundaries of the United States, and north of the forty-fifth parallel; hence, the grant of an absolute quantity of land within 50 miles on either side of the line as it might ultimately be established could be satisfied only by the practical withdrawal from settlement of all land north of the forty-fifth parallel. But the grant, by its terms, contemplated that no lands should be withdrawn from the operation of the land laws until the definite location of the line of the road. At that time, and upon filing a map showing such location, the law withdrew from settlement the lands then remaining unappropriated in the odd numbered sections within the 40-mile limit. All other lands were still left by the grant subject to the ordinary operation of the land laws. The grant was a grant in quantity, subject to the two contingencies: *First*, that the title to the odd numbered sections within the 40-mile limit from the line, as definitely located, should at the time of such location remain in the United States, "not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims or rights." If that should not be the case, then, *second*, that at the time such fact was established, and the company saw proper to exercise, and did exercise, its right to select other lands to indemnify it for lands so lost, there should remain in the odd numbered sections within the specified indemnity limit a sufficient amount of land, unreserved and unappropriated, and free from pre-emption or

other claims or rights, and to which the United States had a like full title, to indemnify the company, in acres, for all land lost in the primary grant. When the company receives all the lands thus designated within both the 40 and the 50 mile limit, then the terms of the grant are fully satisfied. It is proper to add that two members of this court were not qualified to sit in *Railroad Co.* v. *Barnes,* and, under a constitutional provision, District Judges were called in to sit with Chief Justice Corliss, who vigoriously dissented from the opinion of the majority in that case; and no judge of this court has ever concurred in or approved the decision in that case, and, so far as that decision is inconsistent with the views herein announced, it is expressly disapproved.

Respondents' grantor received no title to this land by virtue of its grant. Did it receive title by virtue of its selection? The statute requires the selections to be made "under the direction of the secretary of the interior." In *Jackson* v. *LaMoure Co.,* *supra,* this court said: "It is also necessary for that department [interior department] to determine whether the lands which the company desires to select for indemnity are open to selection,— whether there is not some prior claim upon them in behalf of settlers or others. It is therefore entirely proper that the secretary of the interior should have the right to approve or disapprove of the selection before it becomes final. This is clearly the meaning in the provision of the grant to the Northern Pacific, which declares that the indemnity lands shall be selected by the company 'under the direction of the secretary of the interior,' [citing *Elling* v. *Thexton, supra,* and *St. Paul, etc., R. Co.* v. *Winona, etc., R. Co., supra.*] The statute must have the same construction that would be given it if the word 'approval' had been used in place of the word 'direction.'" The Supreme Court of Minnesota, in a very recent case, (*Resser* v. *Carney,* 54 N. W. 89,) construing this same grant, said: "The selection of indemnity lands, which was to be made 'under the direction of the secretary of the interior,' did not become effectual, nor did the title pass from the United States, at least until the selection was approved or in

some way sanctioned by the secretary of the interior." We think these views entirely sound. This approval may be evidenced by the issuance of a patent, or by the decision of the interior department in any given case that the selection was legal. From these views, it follows that the title to the land in controversy is still in the United States. Respondents are not entitled to the relief they pray, unless they have title to the land. It is clear from the record that a proceeding is now pending, and has been pending at all times since the commencement of this action, in the interior department, to settle the rights of the appellant and respondents' grantor in this particular land. The matter is still in *fieri*, and the exclusive tribunal for the settlement of the question, while the title still remains in the United States, is that department of government especially charged by law with the disposal of the public land. To avoid any confusion that might arise from a misapprehension of our holding, it is proper to add that while a selection by the company without approval of the secretary of the interior is inadequate to pass title to the company, yet such selection so far segregates the land selected from the public domain that no adverse claims can subsequently attach thereto except subject to the ruling of the interior department upon the legality of such selection, and the ultimate approval of such selection vests the title to the land thus selected in the railroad company as of the date of the selection. See *Musser* v. *McRae*, 44 Minn. 343, 46 N. W. 673. The District Court for Traill County is directed to reverse its judgment in this case, and enter judgment dismissing the complaint.

Reversed. All concur.

ON REHEARING.

(Dec. 7th, 1893.)

A rehearing was ordered in this case on the petition of respondents, and the case has been again fully argued. It is first urged upon us that the evidence offered by the defendant in the court below to show that a contest between defendant and plaintiffs' grantor, concerning this same land, was pending in the interior department,

was properly excluded. We did not recite that evidence in the original opinion, and will here state that plaintiffs have been permitted to introduce in evidence an authenticated copy of an opinion rendered in that contest by the secretary of the interior a short time prior to the trial below. Defendant sought to show that the contest was still pending, by showing that defendant had filed a motion for review before the secretary of the interior. For that purpose, S. B. Pinney, Esq., was placed upon the stand, and testified that he was the attorney for the defendant, La Bar, in the contest proceedings, and that he filed a motion for review in said case, and served a copy of said motion on the attorneys for the adverse party, and a paper which Mr. Pinney testified was a copy of said motion was offered in evidence. This paper, as well as the testimony of the witness, was objected to as irrelevant, incompetent, and immaterial, and both were excluded by the court. It is claimed that the parol evidence that the paper was a motion for review was not competent to establish the fact, and the paper itself was inadmissable, because not the best evidence, since § 891, Rev. St. U. S., provides that authenticated copies of papers in the land office shall be evidence equally with the originals. But that statute does not exclude the examined copy. It does not exclude what was before proper evidence. It simply makes that evidence which without this statute was not evidence.

It is urged, however, that it was not shown that the motion was made within the time prescribed by the rules of the department. A sufficient answer is that, when the evidence was excluded, the defendant had not rested, nor had the witness been excused. A party cannot put in all his evidence at once. The defect might have been cured in the further testimony. It was no ground for exclusion at that time. But it is proper to add that this court inadvertently went too far on this point in the original opinion We held this evidence improperly excluded, and then assumed that, if admitted, it would have been conclusive upon the question of the pendency of the contest, and hence ordered the complaint

dismissed. The plaintiff might have rebutted this evidence. The order should have been for a new trial.

It is contended, however, that the secretary of the interior was without jurisdiction to entertain a motion for review; that, when the United States parts with its title, the jurisdiction of the interior department ceases; and, granting that the approval of the secretary of the interior is necessary to pass title to lands selected by the Northern Pacific Railroad Company in the indemnity belt, yet, as stated in the original opinion, such approval may be shown by a decision in any given case, and as, in the opinion of the secretary filed in this case, the selection of the land in controversy was expressly approved, therefore the title at once passed from the general government, and stripped the interior department of jurisdiction. The position has nothing to recommend it except its novelty. It must be true in every jurisdiction that no judgment or decision can be final until the expiration of the time fixed by law or the rules of such jurisdiction in which to apply for a rehearing or review. Otherwise, a review would always be a farce. True, if no such application be made within the time limited, the decision at once becomes final from the date of its rendition; but, if such application be made, it suspends the operation of the decision, and if, on the review, a different conclusion be reached, the former decision becomes of no force or effect whatever. But counsel's brief is devoted principally to an attempt to establish the proposition that the title of the United States to the lands within the indemnity belt of the Northern Pacific Railroad Company passed by the grant of upon the filing of the map of definite location of its line, and hence the jurisdiction of the interior department had ceased, and all further controversies concerning the title to or right in this land must be waged in court. It was to this point that the original opinion was directed, and we will briefly add to what was then said, in order to more directly meet the objections urged by counsel. We stated that the grant was in *præsenti*, as to place lands. It is insisted that it is in *præsenti*, to the amount of 20

sections per mile, provided such amount can be found subject to the grant, and within the lateral limits of 50 miles from the line of definite location. Much stress is laid upon the wording of the grant. The language is "that there be, and hereby is, granted, * * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, * * * whenever on the line thereof," etc. This same language was held in *U. S.* v. *Burlington, & M. R. R. Co.,* 98 U. S. 334, to be a grant in quantity absolute. But in that case the grant was limited by no lateral lines whatever. It was simply an absolute grant of land to the amount of 10 alternate sections per mile. We think that case very instuctive in its bearing upon this case. The government had patented to the Burlington & Missouri River Railroad Company more than a million acres of land outside the 20 mile limit, which would have covered the 10 alternate sections in that case. By far the greater portion of the land thus patented was opposite the western portion of the line. Subsequently, an action was brought to annul these patents on the ground that the company was entitled to nothing outside of the 20 mile limit. The patents were sustained, the courts holding, as already stated, that it was a grant in qantity. But it was urged, also, that, if the company could go outside of that limit, it could not take land opposite one 20 mile section to make good losses accruing opposite a section further east. Said the court: "When no lateral limits are assigned, the land department of the government, in supervising the execution of the act of congress, should undoubtedly, as a general rule, require the land to be taken opposite each section." It appeared that the map of definite location was filed in June, 1865, but the land outside the 20 mile lateral limit was not withdrawn from sale until May, 1872. "Between the definite location of the road in 1865 and the withdrawal of lands outside the 20 mile limit in 1872, the greater part of the land opposite the eastern sections of the road was disposed of by the government, and therefore most of the land covered by

the patents lies opposite the western sections." It would seem perfectly clear that, if title to land outside the 20 mile lateral limit passed to the company upon filing the map of definite location, then the government could not have disposed of the land opposite the eastern section after the filing of such map, and the railroad company, under the rule there declared as to the duty of the land department, would have been required to exhaust all lands in the alternate sections opposite each 20 mile section of the road before it could ask indemnity, for losses opposite one section, out of lands opposite a section further west. The case is direct authority against the position, even in that case, that title to land outside a 20 mile lateral line passed from the government upon filing the map of definite location. True, there was no specified lateral limit in that grant; but in the subsequent case of *Wood* v. *Railroad Co.*, 104 U. S. 329, it was held that the filing of the map of definite location, followed by the immediate withdrawal from sale of all alternate sections within a lateral limit of 20 miles, at once appropriated such lands to the satisfaction of the grant, and no selection within that limit was necessary, because if all remained unreserved and untaken, yet it required all to fulfill the terms of the grant; but "the grantee could only go beyond that limit when it was found that there was a deficiency remaining after all within it had been appropriated."

But the reasons which impel us to hold that, under the grant to the Northern Pacific Railroad Company, nothing passed upon filing the map of definite location except the place lands, are much stronger than under the grant to the Burlington & Missouri River Railroad Company. The general granting language is the same, but in the case of the Northern Pacific that language is followed by an indemnity clause, that necessarily confines it and limits it in its operation. The language is "that there be, and hereby is, granted to the Northern Pacific Railroad Company, * * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of said railroad line, as said

company may adopt, through the territories of the United States, * * * and wherever on the line thereof the United States have full title not reserved, sold, granted or otherwise appropriated, and free from pre-emption or other claims of right, at the time the line of said road is definitely fixed and a plat thereof filed in the office of the commissioner of the general land office; and whenever, prior to said time, any of said sections or parts of sections shall have been granted, sold, reserved or occupied by homestead settlers or pre-empted or otherwise disposed of, other lands shall be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than ten miles beyond the limits of said alternate sections." Respondent says this is a grant of no particular sections, but is a grant of a specific amount, to be taken from alternate sections. The indemnity clause says: "And whenever prior to said time, any of said sections or parts of sections shall have been sold," etc. What sections? If no specific sections were intended, who can say that any of "said sections" have been sold? If the grant was a grant in *præsenti*, to be perfected by the fillng of the map of definite location, of a specific quantity of land, provided it could be found in the alternate sections of a lateral limit of 50 miles, then either there would be no deficiency, or, if there were a deficiency, it never could be compensated, because the 50-mile limit could not be passed, and the privilege which the corporation took under the indemnity clause was the right to indemnify itself for losses sustained within a given territory, but limited to that same territory for its compensation. Again by the grant, the indemnity belt is to extend "not more than ten miles beyond the limits of said alternate sections." If no specific sections were intended, what power can fix the lateral limit? Now, if we say that the present grant was of every alternate section designated by odd numbers, to the amount of 20 alternate sections in number per mile on each side of the line of road, then it is readily determined whether or not any of "said sections" were sold, and, if so, the corporation goes beyond those

sections for its indemnity, and into another belt, 10 miles in width. It goes there, not because the additional land was originally granted to it, but because it was given the privilege to go there in case it failed to obtain certain lands which were originally granted on condition, to-wit: on the condition that at the time of the filing of the map of definite location such land should not be appropriated in the manner in the statute specified. The one construction makes the act an harmonious whole. The other makes it incomprehensible in all its parts. The construction of that grant is for the Federal Courts, but we cannot hold that it was a grant in *præsenti* of indemnity lands until the Federal Courts have clearly so decided. We are cited to know such holding. The case of *St. Paul, & P. R. Co.* v. *Northern Pac. R. Co.*, 139 U. S. 1, 11 Sup. Ct. 389, is again urged upon us with confidence. We have already distinguished that case, and we repeat the distinguishing feature: There the land was withdrawn from sale, and it affirmatively appeared that all the land within the alternate indemnity sections would not make good the losses in that jurisdiction, and it is expressly stated that selection by the secretary was not required for that reason. Here, it is not shown that all lands in the indemnity sections were required to make good losses sustained, and it expressly appears that the land was not withdrawn from sale. Moreover, that case would seem, by the subsequent case of *U. S.* v. *Colton, Marble & Lime Co.* 146 U. S. 615, 13 Sup. Ct. 163, to be limited to contests between railroad companies under conflicting grants.

Since the original opinion herein was filed, the case of *Railroad Co.* v. *Araiza*, 57 Fed. 98, which arose in the southern district of California, has been published, and it is relied upon as authority for respondents' position. It will not bear that construction. It is a substantial repetition of *Railroad Co.* v. *Wiggs*, 43 Fed. 333. In each case the land had been patented to a settler, and the action was brought in equity to declare the patentee a trustee for the railroad company. Both actions arose in California, where the lateral limit to the indemnity land was only 30 miles. In each

case the land was required to make up the deficiency in place lands, and in each the rights of the settler were initiated after the land was withdrawn from sale, both by the operation of the grant and by order of the department. The case in 57 Fed. is based upon the Buttz case, in 119 U. S. 55, 7 Sup. Ct. 100, for, after quoting from that case the same language quoted in our original opinion, the court says: "The language of the sixth section of the two acts, being in substance, and almost literally, the same language of the Supreme Court above quoted, is equally applicable to the case here. If, as there held, the law itself withdrew from sale or pre-emption the odd sections to the extent of 40 miles on each side of the road represented by the map of general route, manifestly, it withdraws from sale or pre-emption the odd sections within the limits named in the grant on each side of the line of road, as fixed by the map of definite location. Such being the true construction of the statute as declared by the Supreme Court, it would seem to result necessarily that all of the odd sections within the indemnity, as well as in the primary, limits of the grant contained in the act of July 27th, 1866, were withdrawn from sale or pre-emption without regard to the order of withdrawal promulgated by the secretary of the interior through the commissioner of the general land office, and consequently they were not open to entry or settlement at the time of defendant's entry and settlement thereon." To distinguish that case, we need only remember that the land here in controversy is beyond the 40 mile limit, withdrawn by virtue of the grant, and there was no order of withdrawal in force at the time of defendant's settlement. We by no means overlook the fact in the original opinion that the selection of indemnity lands was, under the grant, to be made by the company. We give that language full force. The selection segregates the land, and if approved, cuts off all claimants subsequent to such selection. But is does not pass title. A grantee cannot pass title to himself. This grant, as we have seen, did not pass title. It gave only a right to select. It requires the approval of the selection to pass title. It will not do to say that

the selection itself, where the land is subject to selection and a corresponding loss exists, passes title. The law does not so declare, and land titles must not rest upon a foundation so uncertain. Every man is entitled to trace his title through an authorized record. It must not be left to stand one day, and fall the next, as he may or may not be able to prove certain facts.

There is but one more point upon which we care to add anything to the original opinion. It is urged that, granting that respondents stand simply upon an unapproved selection, yet they have a right to maintain this action to restrain the injurious acts of a mere trespasser. The proposition begs the question. We are required to assume that appellant is a trespasser, while, if his contention be sustained, he is a pre-empter lawfully in possession of a portion of the public domain; and that is the essence of the contest which appellant sought to show was pending before the secretary of the interior. Applications to file pre-emption declaratory statements upon unapproved selections were expressly recognized by the order of August 15th, 1887, revoking the former order of withdrawal of these lands. But of what avail could such application be if the applicant is not permitted to maintain his settlement? The fact that this land is segregated by selection does not preclude an application to make a filing thereon. It only subjects such application to the final ruling on the selection. It is urged that in *Wisconsin Cent. R. Co.* v. *Price Co.*, 133 U. S. 496, 10 Sup. Ct. 341, plaintiff, standing only upon unapproved selection, was permitted to maintain an action to remove a cloud from the title. The point is not very clear, as the case is reported. The decision does not mention it. In that case the land came through the state, and it is recited in the opinion that the selections made by the state agent had never been approved by the secretary of the interior. The action was brought in April, 1884. The fourth finding of fact by the trial court—and which does not appear to have been questioned—reads: "That on the 25th day of February, 1884, the plaintiff received a patent from the state for all of said lands, and thereby acquired the absolute title in fee to

the same," and the statement of facts by Mr. Justice Field recites that in April, 1884, the plaintiff was the owner of certain lands situated, etc., and had a patent for them from the state, bearing date on the 25th of February, 1884. In that state of the record it cannot be said that plaintiff stood only upon an unapproved selection. For the error already noticed, the former order herein will be modified, and the trial court directed to reverse its judgment and order a new trial. With that modification, we adhere to our former opinion. All concur.